No. 81-369

IN THE SUPREME COURT OF THE STATE OF MONTANA

1982

---

AARON P. SMALL,

Plaintiff and Appellant,

vs.

ROBERT J. McRAE,

Defendant and Respondent.

---

Appeal from: District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone
Honorable Charles Luedke, Judge presiding.

Counsel of Record:

For Appellant:

Moses Law Firm, Billings, Montana
Charles F. Moses, Billings, Montana

For Respondent:

John Bobinski argued, Helena, Montana
J. Michael Young, Helena, Montana

---

Submitted: May 12, 1982

Decided: October 4, 1982

Filed: OCT 4 - 1982

*Thomas J. Kearney* Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

The appellant, Professor Aaron P. Small, filed a one count libel action against the respondent, Dean Robert J. McRae, and McRae moved for summary judgment. Small then moved to amend his complaint. The Thirteenth Judicial District, in and for Yellowstone County, granted Dean McRae's motion for summary judgment and denied Small's motion to amend the complaint. The third count of Small's proposed amended complaint was denied without prejudice to his right to replead. Small appeals.

The appellant was the appointed and acting chairman of the English Department at Eastern Montana College. On October 10, 1980, the respondent, Robert J. McRae, as Dean of the school of liberal arts, terminated appellant's chairmanship and in connection therewith addressed and delivered a memorandum to him as a way of notifying him and the other departments of such change in chairmanship, as provided by section 9.100(F)(1)(c) (Transfer of Titles) of the collective bargaining agreement in force at Eastern Montana College at that time. The reasons cited for the change included inadequate leadership that failed to bring a polarized department into a smoother-functioning unit, increased acrimony within the department, failure to handle the administrative functions of the office effectively and conscientiously and, finally, concern over the past and ongoing coordination of the newly-instituted mass placement process for freshman composition. The memorandum ends by stating:

> "Thank you, Al, for the efforts you have expended in this very difficult position in the past seven months. I am sorry that this administrative appointment has not worked out. I wish you my sincere goodwill as you return to full-time teaching, which I know is your first love. My esteem for you as a teacher of your discipline is untarnished."

Termination of this chairmanship carried with it loss of a stipend of $900 per academic year and $150 per summer session, but did not affect appellant's academic rank, tenure, base salary or membership in the collective bargaining unit. Although the

- 2 -

collective bargaining agreement provided a grievance procedure which appellant could have pursued, he elected instead to file this libel action against Dean McRae. We agree with the trial judge's factual findings and adopt his memorandum.

Originally, this was an action in libel and was submitted to the trial court on two motions. One by which the appellant sought to file an amended complaint adding four new counts. The original complaint sought damages caused by the alleged libel. The amended complaint alleged Count I, the same as the original complaint; Count II, appellant was deprived of due process contrary to his rights guaranteed by the Constitution of the United States and the State of Montana; Count III, appellant was denied freedom of expression and speech in violation of his rights under the United States Constitution and Constitution of the State of Montana; Count IV, that the libel alleged in Count I violates the privileges and immunities clause and the equal protection clause of the United States Constitution; Count V, that any statutory privilege given by legislature is contra to Montana and United States Constitutions.

Before getting into a discussion of the individual counts of appellant's proposed amended complaint, respondent asserts as a general matter that appellant's motion to amend should be denied on the ground that justice would not be served through the granting of it. In support of this argument the respondent points out that, as a member of the collective bargaining unit, the appellant agreed to exercise the grievance procedure to settle all disputes alleging breach, misinterpretation or improper application of the terms found in the collective bargaining agreement.

The official state policy, relating to collective bargaining agreements, is found in section 39-31-101, MCA: "it is the policy of the State of Montana to encourage the practice and procedure of collective bargaining to arrive at friendly adjustment of all disputes between public employers and their employees."

As correctly pointed out by the respondent, this Court has looked to the construction placed on the National Labor Relations Act by the federal courts as an aid to interpretation of the Montana Public Employees Collective Bargaining Act. See, for example, State ex rel. Department of Highways v. Public Employees Craft Council (1974), 165 Mont. 349, 529 P.2d 785.

Section 39-31-306(2), MCA, of the Montana Public Employees Collective Bargaining Act, states that a collective bargaining agreement may contain: "a grievance procedure culminating in final and binding arbitration of unresolved grievances and disputed interpretations of agreements." The collective bargaining agreement of Eastern Montana College contained such a provision in this case. See, section 12.100, et seq.

Finally, section 39-31-306(3), MCA, provides that:

> "[a]n agreement between the public employer and a labor organization shall be valid and enforced under its terms when entered into in accordance with the provisions of this chapter and signed by the chief executive officer of the state or political subdivision or Commissioner of higher education or his representative."

As correctly noted by the respondent, the federal courts, construing the Federal National Labor Relations Act, have enunciated a strong policy favoring arbitration of labor disputes and requiring contract grievance procedures to be exhausted prior to the commencement of a lawsuit. See, for example, Republic Steel Corporation v. Maddox (1965), 379 U.S. 650, 652-653, 85 S.Ct. 614, 616-17, 13 L.Ed.2d 580, wherein Justice Harlan stated:

> "As a general rule in cases to which federal law applies, federal labor policy requires that individual employees wishing to assert contract grievances must attempt use of the contract grievance procedure agreed upon by employer and union as the mode of redress. If the union refuses to press or only perfunctorily presses the individual's claim, differences may arise as to the forms of redress then available. (Citations omitted.) But unless the contract provides otherwise, there can be no doubt that the employee must afford the union the opportunity to act on his behalf. Congress has expressly approved contract grievance procedures as a preferred method for settling disputes and stabilizing the 'common law' of the plant. (Citations omitted.)

- 4 -

"Union interest in prosecuting employee grievances is clear. Such activity compliments the union's status as exclusive bargaining representative by permitting it to participate actively in the continuing administration of the contract. In addition, conscientious handling of grievance claims will enhance the union's prestige with employees. Employer interests, for their part, are served by limiting the choice of remedies available to aggrieved employees. And it cannot be said, in the normal situation, that contract grievance procedures are inadequate to protect the interests of an aggrieved employee until the employee has attempted to implement the procedures and found them so. (Emphasis supplied.)

"A contrary rule which would permit an individual employee to completely sidestep available grievance procedures in favor of a lawsuit has little to commend it. In addition to cutting across the interests already mentioned, it would deprive employer and union of the ability to establish a uniform and exclusive method for orderly settlement of employee grievances. If a grievance procedure cannot be made exclusive, it loses much of its desirability as a method of settlement. A rule creating such a situation 'would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements.' (Citations omitted.)"

Only in those cases where it is certain that the arbitration clause contained in a collective bargaining agreement is not susceptible to an interpretation that covers the dispute is an employee entitled to sidestep the provisions of the collective bargaining agreement. See, Torrington Company v. Metal Products Workers Union Local 1645 (2nd Cir. 1966), 362 F.2d 677. The respondent argues that the same considerations and policies which mandate the use of the grievance and arbitration procedures under the federal act apply equally to disputes which arise under the State Public Employees Collective Bargaining Act.

All the allegations contained in the appellant's proposed amended complaint revolve around his removal as chairman of the English Department at Eastern. The argument boils down to whether proper procedures were used. Such a contention most definitely falls within the collective bargaining agreement's definition of "grievance," as: "an allegation by a faculty member . . . that there has been a breach, misinterpretation or

improper application of the terms of this agreement by the administration." To allow a member of the collective bargaining unit to completely sidestep available procedures would, just as under federal law, exert a disruptive influence upon both the negotiation and administration of collective bargaining agreements and effectively deprive employers and unions of the ability to establish a uniform and exclusive method for the orderly settlement of employee grievances.

The respondent contends that because the appellant has had the benefit of the collective bargaining agreement, and yet chooses to ignore the contractual grievance procedure, justice would not be served by condoning his violation of the agreement and allowing him leave of court to amend his complaint and state additional grievances against respondent, McRae, and the proposed new defendants.

In answer to the respondent the appellant argues that the grievance procedures contained in the collective bargaining agreement need only be followed in contractual disputes. The appellant urges that the issue in this case does not center on a contractual dispute but, rather, on a violation of a constitutionally protected right. Appellant proceeds to develop this argument by first pointing out that constitutional provisions cannot be modified by statute. See, Noll v. City of Bozeman (1975), 166 Mont. 504, 534 P.2d 880, and Madison v. Yunker (1978), 180 Mont. 54, 589 P.2d 126. Appellant concludes by stating that constitutional rights cannot be modified by private contract. Such a contract would be unenforceable.

This result finds support in section 1-3-204, MCA: "Waiver of benefit of a law. Anyone may waive the advantage of a law intended solely for his benefit. But a law established for a public reason cannot be contravened by a private agreement." The rule that a law established for a public purpose cannot be contravened by a private agreement is also supported in the case law. See, for example, New Silver Bell Mining Company v.

County of Lewis and Clark (1955), 129 Mont. 269, 284 P.2d 1012; and State ex. rel. Neiss v. District Court (1973), 162 Mont. 324, 511 P.2d 979.

The appellant's point is that his right to litigate the constitutionality of the procedures used in removal of his title cannot be limited by contractual agreement. Although the law cited by the appellant is correct, the premises upon which it is based is here called into question.

The issue to be determined is whether this is, in fact, a violation of a constitutionally protected right, or merely a contractual dispute. The answer to that question follows in connection with consideration of the individual counts of the proposed amended complaint.

With these introductory matters completed, attention is directed to the individual counts which appellant sought to incorporate into the action via amendment of his complaint.

The proposed Count II alleges that the appellant was deprived of constitutional due process in that the memorandum which led to his dismissal as chairman placed in issue his good name, reputation, honor and integrity without giving him notice or opportunity to be heard. In support of this allegation, appellant relies on Board of Regents v. Roth, (1972), 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548, and Perry v. Sindermann (1972), 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570.

These authorities, and the numerous others cited by appellant in the totality of the briefing he has submitted, are subject to the factual distinction that they involved summary dismissals from public employment, or the equivalent thereof, which is not the case here. Although such distinction may be one of degree only, it is nevertheless pertinent in determining whether any requirement of due process has been fulfilled.

"'Due process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances.'" Cafeteria and Restaurant Workers v. McElroy

(1961), 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230. "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." Morrissey v. Brewer (1972), 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484. "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" Mathews v. Eldridge (1976), 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18, 32.

A determination of whether the procedures followed in any given case is constitutionally sufficient requires an analysis of the governmental and private interests that are affected by the action taken. As stated in Arnett v. Kennedy (1974), 416 U.S. 134, 167, 168, 94 S.Ct. 1633, 1651, 40 L.Ed.2d 15; by the United States Supreme Court:

> "Having determined that the constitutional guarantee of procedural due process applies to appellee's discharge from public employment, the question arises whether an evidentiary hearing, including the right to present favorable witnesses and to confront and examine adverse witnesses, must be accorded before removal. The resolution of this issue depends on a balancing process in which the Government's interest in expeditious removal of an unsatisfactory employee is weighed against the interest of the affected employee in continued public employment. (Citations omitted.) As the Court stated in Cafeteria and Restaurant Workers v. McElroy, [supra] 'consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action.'"

In short, due process is not a fixed concept but, rather, is one which must be tailored to each situation in such a way that it meets the needs and protects the interests of the various parties involved. The due process requirements applicable to someone destined to suffer the grievous loss associated with termination of employment are different from the due process requirements necessary to protect the interests of a college professor who suffers the loss of his title as department chairman and the nominal stipend which accompanies it.

It is concluded that the governmental interest in orderly administration necessary to prevent disruption of the educational process is sufficient to allow summary dismissal of department chairmen when the requirements of due process are accommodated through the grievance and arbitration procedure outlined in section 12.000, et seq., of the collective bargaining agreement. These procedures give aggrieved faculty members the opportunity to challenge any alleged breach, misinterpretation or improper application of the terms of the collective bargaining agreement. Although they were not exercised, these procedures were available to the appellant to seek reinstatement as department chairman. Such a grievance procedure affords the appellant an opportunity to be heard at a meaningful time and in a meaningful manner. The requirements of due process are thereby met. It follows that Count II does not set forth a cognizable claim and permitting its incorporation into the action by the requested amendment would be a futile act.

Count III of the proposed amended complaint is grounded upon the allegation, stated in general terms, that appellant was terminated and discharged as a direct result of the exercise of his constitutionally guaranteed freedom of speech and expression with respect to the conduct of the department and the administration. It also alleges in a reverse form that the termination and discharge concerned proximately results in a denial of his right to freedom of speech and expression.

It is settled that a valuable governmental benefit, such as a job, may not be denied on a basis which infringes ones constitutionally-protected interests, especially ones interest in freedom of speech. Perry v. Sindermann, supra, and 42 U.S.C. section 1983 (Civil Rights Statute).

The problem with Count III is, first, whether removal of appellant from his title and stipend as chairman of the English Department, but not from his job, constitutes a valuable governmental benefit which falls under the protection accorded in Perry

mitting its incorportion into the action by the requested amendment would be a futile act. However, this does not mean that the appellant is not entitled to replead his proposed Count III in order to meet the requirement of specificity in its allegations through the medium of a proper motion and notice and hearing thereon.

In view of this, the question of whether a chairmanship title does constitute a valuable governmental benefit is not reached or determined at this time. Likewise, the question of the effect, if any, of the grievance procedure provided in the collective bargaining agreement as the same applies to Count III cannot be determined unless repleading is accomplished.

Counts IV and V of the proposed amended complaint are different hues of a constitutional challenge founded upon the privileges and immunities clauses and equal protection clauses of the Montana and Federal Constitutions. In substance, they comprise a challenge to the validity of the statutory privilege accorded to a publication made in the proper discharge of a public duty. The efficacy of this privilege is the basis of the defense asserted by respondent McRae and, also, the basis for his motion for summary judgment lodged against both the action stated in the original complaint and Count I of the proposed amended complaint. Consequently, they will all be treated together in the discussion which follows:

Libel is defined in Section 27-1-802, MCA, as: "a false and unprivileged publication . . . which exposes any person to hatred, contempt, ridicule, or obloguy or which causes him to be shunned or avoided or which has a tendency to injure him in his occupation." Section 27-1-804, MCA, in turn, defines what publications are privileged: "A privileged publication is one made: (1) In the proper discharge of an official duty . . ."

In the case of Storch v. Board of Directors of Eastern Montana Region Five Mental Health Center (1976), 169 Mont. 176, 181-182, 545 P.2d 644, 647-648, this Court had the occasion to

v. Sindermann, supra; and, second, whether the allegations of Count III, as presently framed, satisfy the requirements of specificity applicable to a claim of a denial of first amendment privileges.

The memorandum issued by Dean McRae, the alleged offensive portion of which is incorporated into Count III by reference from Count I of the amended complaint, gave as reasons for appellant's loss of title his inadequate leadership, his failure to bring a polarized department into a smoother functioning unit, the fact that acrimony had increased within the English Department, his failure to effectively and conscientiously handle the administrative detail associated with the office, and his failure to properly coordinate the newly instituted mass placement process for freshman composition.

Although these reasons are alleged to be false, nowhere are they offset by allegations in Count III, specifying what speech or expression was exercised by the appellant which is entitled to constitutional protection as having a proximate relevance to the loss of his title of chairman of the English Department.

As stated in Rotolo v. Borough of Charleroi (3rd Cir. 1976), 532 F.2d 920, 923:

> "The allegations in the complaint strike us as vague and conclusory. They fail to indicate, when, where, and how Rotolo had 'exercised his first amendment privileges,' rendering it impossible to determine if indeed his activity was the sort afforded protection under the first amendment and whether it had any relevance to the termination of his employment. The allegations state no facts upon which to weigh the substantiality of the claim; they do not aver the content of the alleged first amendment exercise."

See, also, Kennedy v. H & M Landing, Inc. (9th Cir. 1976), 529 F.2d 987; Kauffman v. Moss (3rd Cir. 1970), 420 F.2d 1270, cert. denied (1970), 400 U.S. 846; Negrich v. Hohn (3rd Cir. 1967), 379 F.2d 213; and Valley v. Maule (D.Conn. 1968), 297 F.Supp. 958.

It is concluded that Count III of the amended complaint, as presently framed, does not set forth a cognizable claim and per-

consider this code section and it stated:

> "A privileged communication is one which, except for the circumstances under which it is made, may be defamatory and actionable. (Citation omitted.)

> ". . .

> "While some of the quoted subsections do mention malice the pertinent subsection 1, says nothing about qualified privilege. Rather it constitutes an absolute privilege with the only requirement being that the intradepartment communication be one rendered while engaged in an 'official duty.' There can be no doubt that the hiring and firing of employees is part of the 'official duty' of the Montana Regional Health Centers.

> ". . .

> "Whether statements made by such public officers in relation to the hiring and firing of employees may be subject to absolute privilege has been answered in the affirmative many times. Under facts similar to the instant case, the United States Supreme Court in Barr v. Matteo, 360 U.S. 564, 571, 79 S.Ct. 1335, 3 L.Ed.2d 1434, 1441, stated that insofar as a public officer was acting within the scope of his authority his communication was absolutely privileged. (Citations omitted.) The Court went on to say why an absolute privilege as essential in such a circumstance, quoting approvingly from Judge Learned Hand's decision in Gregoire v. Biddle, 2 Cir., 177 F.2d 579, 581:

> "'. . . it is impossible to know whether the claim is well founded until the case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties . . .'

> "Since the internal communication was within the proper discharge of an official duty, it enjoyed an absolute privilege and could therefore not be the subject of libel action."

To put the meaning of Storch in perspective for application to this case, certain provisions of the collective bargaining agreement and a Montana code section should be noted.

The provision in the collective bargaining agreement which allows the dean to remove department chairmen, and implements procedures for the selection of a new chairman, is authorized under section 20-25-301, MCA. Subsection 11 of this statute

- 12 -

allows the regents to: "appoint a president and faculty for each of the institutions of the system, appoint any other necessary officers, agents, and employees, and fix their compensation." Subsection 15, in turn, allows the regents to: "confer, at the regents' discretion, upon the president and faculty of each of the units of the system for the best interest of the unit such authority relating to the immediate control and management, other than financial, and the selection of teachers and employees."

The collective bargaining agreement provides in connection with transfer of title, being section 9.100(F)(1)(c):

> "1. The appropriate Dean will implement procedures for the selection of a new academic administrative unit Chairperson when one of the following conditions occurs:
>
> "a. . . .
>
> "b. . . .
>
> "c. The Dean notifies all members of the unit and the Chairperson that in his or her judgment a change should take place."

The collective bargaining agreement also provides a grievance procedure under section 12.100. This section defines "grievance," as: "An allegation by a faculty member or the A.A.U.P. that there has been a breach, misinterpretation or improper application of the terms of this agreement by the administration." This section also provides that: "A grievance must be filed by a faculty member of the A.A.U.P. within thirty (30) days from the date the grievable event was determined. Any grievance not processed in accordance with the time limit specified herein shall for the purposes of this agreement be deemed null and without further recourse." The collective bargaining agreement then details a procedure for the settlement of grievances. In the event that the procedure is followed and the grievance remains unsettled, binding arbitration is provided for under section 12.200.

Just as this Court in Storch found that the hiring and firing of employees was an official duty of the Montana Regional Health Centers, there seems to be little question in this case that the

statutory authority conferred upon the board of regents under section 20-25-301(15), MCA, as well as the enumerated duty found in section 9.100(F)(1)(c) of the collective bargaining agreement giving the appropriate dean power to remove departmental chairpersons, makes the memorandum in question an official duty subject to absolute privilege under the statute.

The _Storch_ decision also points out two important concepts: First of all, once a communication is labeled as privileged, it is not defamatory and therefore not actionable. Secondly, the absolute privilege arises when the intradepartment communication is rendered during the course of an official duty.

The appellant raises a number of issues questioning the propriety of the defense of absolute privilege:

1. First of all, he asserts "a constitutional right to employment." In light of this right to employment, the appellant argues that due process requires a notice and opportunity to be heard before anyone can be deprived of such a property right. Appellant concludes by stating that any dismissal without such notice and opportunity to be heard would not be a _proper_ discharge of an official duty, and therefore no statutory privilege would arise.

The merits of the due process assertion have already been discussed in connection with Count II of the proposed amended complaint and will not be repeated here. Suffice it to say that appellant's view does not prevail.

2. The second issue raised by the appellant in opposition to the motion for summary judgment is that, in order for there to be a proper discharge of an official duty which gives rise to the statutory privilege, there must be compliance with the requirements of the collective bargaining agreement. Appellant raises three alleged violations of the collective bargaining agreement:

First, that there was no notification to all members of the unit under section 9.100(F)(1)(c).

Secondly, appellant argues that this section of the col-

lective bargaining agreement requires only that the dean give notice that a change should take place. There is no requirement that the dean give any reason necessitating a change. To give such a reason is beyond the proper discharge of an official duty.

Thirdly, the appellant argues that the collective bargaining agreement only requires a notice from the dean that a change should take place --- not a judgment that the removal of the department chairperson has taken place.

In support of the first of these contentions, appellant states that evidence to be set forth in affidavit form will clearly show that the requirement of notification was not followed by the dean until some later period of time. Appellant's affidavits filed February 13 and 24, 1981, make no mention of compliance with this requirement.

The respondent notes in this regard that the affidavits filed by Dr. Larry Jones and President Van de Wetering show that the respondent was acting within the scope of his official duties and did discharge those duties in a proper manner when he removed the respondent's title of chairman of the English Department. The memorandum which is the basis of this lawsuit also contained a notation at the bottom that photocopies were sent to members of the Departments of English, Philosophy, Humanities and Religious studies. Finally, in this regard, the collective bargaining agreement only requires that the dean notify all members of the unit and the chairperson that a change should take place. There is no requirement that such notice to the unit and the chairperson be contemporaneous. It is evident here that notification of all unit members did take place and the only evidence in the record seems to indicate that the notification was proximate to the notification given to the appellant.

Turning to appellant's second argument we find the contention raised that because the collective bargaining agreement does not specifically require the dean to give reasons for the removal of a department chairman, to give such reasons would violate the

collective bargaining agreement and would not be a proper discharge of an official duty. Although the respondent does not address this issue beyond reference to the affidavits which note that the dean did properly discharge his duties under the collective bargaining agreement, appellant's argument would appear to be without merit. It would seem to be necessarily implied in any requirement of notification before removal that the reasons supporting such a determination be given to the outgoing chairman to put him on notice of why the change is necessary.

The third, and final, argument which appellant raises in support of his contention that the requirements of the collective bargaining agreement were not met is that the notification only requires a judgment that the change should take place, rather than a judgment that the determination has taken place. Once again, the respondent does not address this argument beyond citation to the two supporting affidavits which note that the respondent properly discharged his duties under the collective bargaining agreement.

The appellant's argument here is based on a semantic interpretation of the definition to be given to the word, "should," as contained in the collective bargaining agreement. Appellant believes that "should," as used in this case, means "shall," and is therefore not a final determination. As used in this case, however, "should" does appear to be a final determination.

Once the dean notifies the unit members and the department chairperson that a change should take place, the procedures for selection of a new department chairperson are implemented. These procedures are found at section 9.100(F)(1)(a) through (f). The procedures for selection of a new department chairperson do not contemplate any consideration of the dean's determination that a change in the chairmanship of the department should take place. Such a determination by the dean appears to be final and the correct avenue of appeal from such a decision would be the

grievance and arbitration procedures spelled out at section 12.000 of the collective bargaining agreement. The procedures followed by the dean do not appear to violate the collective bargaining agreement.

3. The third contention raised by the appellant in opposition to respondent's motion for summary judgment is that libel is a violation of the Montana code, and therefore it would not be a proper discharge of an official duty to libel someone --- therefore, no statutory privilege would arise. The circular reasoning involved in this argument is apparent. Once it is determined that the statement was made in the proper discharge of an official duty, it is considered privileged and no longer falls within the definition of libel. Not falling within the definition of libel, such a statement would not be an actionable tort.

4. The fourth argument which the appellant raises in opposition to respondent's motion for summary judgment is that reliance upon any statute granting public officials absolute privilege and thereby making them immune from prosecution for libel arising during the proper discharge of an official duty conflicts with the governmental immunity statute, and is therefore unconsitutional in light of Art. II, Sec. 18, 1972 Mont.Const. This section provides that there shall be no sovereign immunity except as specifically provided by law and two-thirds vote of each House.

Section 2-9-101(1)(d), MCA, addresses governmental immunity, and states in the definitional section: "'Personal injury' means any injury resulting from libel, slander, malicious prosecution, or false arrest, any bodily injury, sickness, disease, or death sustained by any person and caused by an occurrance for which the State may be held liable." Sections 2-9-111 through 2-9-114, MCA, spell out the immunity which the legislature has seen fit to grant to the legislative body, the members, officers and agents of the judiciary, the governor's office and local government officials discharging official duties associated with approving

or vetoing ordinance, or while involved in legislative activity. Section 2-9-305, MCA, spells out when the governmental entity is to be joined as a defendant and provides for the immunization and indemnification of employees whose negligence or wrongful act, error or omission, or other actionable conduct gave rise to the claim --- unless the claim is based on an intentional tort or felonious act of the employee.

The appellant argues that these code sections modify and explain the provisions of the libel statute and show that the immunity granted in libel actions is not absolute because it does not cover torts that are intentional or felonious. The respondent counters this argument by pointing out that section 2-9-101(a), MCA, provides:

> "'Claim' means any claim against a governmental entity, for money damages only, which any person is legally entitled to recover as damages because of personal injury or property damage caused by a negligent or wrongful act or omission committed by any employee of the governmental entity while acting within the scope of his employment, under circumstances where the governmental entity if a private person, would be liable to the claimant for such damages under the laws of the state."

In the case of State ex rel. Byorth v. District Court (1977), 175 Mont. 63, 67, 572 P.2d 201, 203, this Court stated: "the Tort Claims Act attaches liability to the State in the same manner and to the same extent that liability attaches to a private person." There can be no legal entitlement to recovery for liability when the action complained of does not fall within the definition of a tort. Before a writing is considered an actionable libel, the Montana statute requires that it be unprivileged. Once the determination is made that the writing is privileged, no actionable tort exists and there is no legal entitlement to recovery. The two code sections are complementary, and no constitutional violation exists.

5. The fifth argument which the appellant raises in opposition to the respondent's motion for summary judgment is that the United States Supreme Court, in the case of Butz v. Economou

(1978), 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895, impliedly overruled its earlier decision in Barr v. Matteo, supra. Appellant argues that because this Court in Storch, supra, relied on Barr in support of its decision, Storch is no longer good law. The Butz case arose under 42 U.S.C., section 1983, and considered the issue of whether a federal official is personally immune if, in the course of enforcing a statute, he infringes someone's constitutional rights. Federal officials may not, with impunity, discharge their duties in a way that is known to them to violate the constitution or transgress a clearly established constitutional rule.

In answer to this argument the respondent first points out that this lawsuit arises under state law and, as such, this Court has the final say as to the state law governing the suit. This rule is clearly implied in the holding of Erie Railroad v. Tompkins (1938), 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188:

> "Except in matters governed by the Federal Constitution or by Acts of Congress, the law to be applied in any case is the law of the State. And whether the law of the State shall be declared by its Legislature in a statute or by its highest Court in a decision is not a matter of federal concern. There is no federal general common law. Congress has no power to declare substantive rules of common law applicable in a State whether they be local in their nature or 'general,' be they commercial law or a part of the law of torts. And no clause in the Constitution purports to confer such a power upon the federal courts."

The Storch decision being the latest pronouncement by this Court on the issue of statutory privilege in libel actions, the decision is still good law.

In Storch, this Court stated that in order to take advantage of the absolute privilege provided under section 27-1-804(1), MCA:

> "the only requirement [is] that the intradepartment communication be one rendered while engaged in an 'official duty.'" Storch, 169 Mont. at 181, 545 P.2d at 647.

If the respondent's actions fall within this exception, then the

- 19 -

memorandum in question would be absolutely privileged within the statute and an absolute defense to the libel action found in the original complaint and Count I of the amended complaint.

Secondly, the respondent points out that the _Butz_ case did not overrule _Barr_. The cases involved different issues. In _Barr_, the question was whether a federal officer could be held liable for the tort of defamation based on a publication issued within the official's authority. _Butz_, on the other hand, was a section 1983 action, which considered the issue of a federal official's personal immunity where, in the course of enforcing a statute, the federal official infringes someone's constitutional rights. Moreover, this Court in _Butz_ recognized that its decision was consistent with _Barr_. At 438 U.S. 507, the Court stated:

> "We therefore hold that, in a suit for damages arising from unconstitutional action, federal executive officials exercising discretion are entitled only to the qualified immunity specified in _Scheuer_ [Scheuer v. Rhodes, 416 U.S. 232] subject to those exceptional situations where it is demonstrated that absolute immunity is essential for the conduct of the public business.
>
> "The _Scheuer_ principle of only qualified immunity for constitutional violations is consistent with Barr v. Matteo, . . ."

Justice Rehnquist, joined by the Chief Justice, Justice Stewart and Justice Stevens, in a separate opinion, stated the following at 438 U.S. 522:

> "Here the Court at least recognizes and reaffirms the minimum proposition for which _Barr_ stands--that executive officials are absolutely immune at least from actions predicated on common-law claims as long as they are acting within the outer limits of their authority. (Citation omitted.) _Barr_ is distinguished, however, on the ground that it did not involve a violation of 'those fundamental principles of fairness embodied in the constitution.'" (Citation omitted.)

From this language we can see that _Barr_, relied upon by this Court to support its decision in _Storch_, was not overruled by the United States Supreme Court in _Butz_. Additionally, _Storch_ is within the modern trend of the law which extends to lower public officials an absolute privilege in regard to statements made in

connection with the hiring and discharge of employees. See, 26 ALR 3rd 492.

As a final contention, appellant urges that reliance upon Storch would be misplaced in this case because, in Storch, the plaintiff asked the Court to read into the statute on privileged communications that there must be an absence of malice before such a defense will arise. No such claim is made in this case; therefore, the respondent asserts that reliance on Storch is inappropriate because the language cited by the respondent is dictum not relating to issues specifically presented to the Court.

The defendant in Storch specifically relied on absolute privilege under the statute as a complete defense to the libel claimed. When the plaintiff attacked the propriety of the defense by alleging that the statute requires an absence of malice, the Court necessarily had to determine what requirements must be met before the defense of absolute privilege arises. The resolution of the issue was necessary to the Court's decision and therefore not dictum.

6. Appellant alleges that it is improper in a libel case to grant a motion for summary judgment and dismissal in light of Art. II, Sec. 7, 1972 Mont.Const. This provision gives to juries the right to determine both the law and the facts in a libel case. Appellant argues that the jury here must be given the right to determine whether the defendant can properly rely upon the absolute privilege under section 27-1-804, MCA.

The issue has been clearly settled by this Court in Griffin v. Opinion Publishing Company (1943), 114 Mont. 502, 138 P.2d 580, and Manley v. Harer (1928), 82 Mont. 30, 264 P. 937. In Manley, the Court held that where there is a failure to establish an essential element of the cause of action, the case becomes one of law for the Court. See, also Cooper v. Romney (1914), 49 Mont. 119, 141 P. 289.

7. Appellant raises one final argument in opposition to

respondent's motion for summary judgment. The appellant contends that summary judgment would not be proper because a disputed question of fact is outstanding. Based on appellant's affidavit, briefs and pleadings, it is argued that the question of whether appellant's actions were a proper discharge of an official duty is still disputed.

In the case of State ex rel. City Motor Company v. District Court (1974), 166 Mont. 52, 55, 530 P.2d 486, 487, this Court gave citation to Moore's Federal Practice Digest and noted that a party opposing a motion for summary judgment: "must present facts in proper form--conclusions of law will not suffice; and the opposing party's facts must be material and of a substantial nature, not fanciful, frivolous, gauzy, nor merely suspicions." Rule 56(e) of the Montana Rules of Civil Procedure provides that supporting and opposing affidavits, "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matter stated therein . . . [and shall show] that there is a genuine issue for trial." Rule 56(e) M.R.Civ.P. Rule 56(c) states that a motion for summary judgment, "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c) M.R.Civ.P.

In the case of Harland v. Anderson (1976), 169 Mont. 447, 450, 548 P.2d 613, 615, this Court noted:

> "This Court has on many occasions commented upon the nature of the burden of proof imposed on the moving party under Rule 56. The Court has consistently held that the party moving for summary judgment has the burden of showing the complete absence of any genuine issue as to all facts which are deemed material in light of those substantive principles which entitled him to a judgment as a matter of law. We have also held the rule operates to hold the movant to a 'strict standard' and that:
>
> "'. . . To satisfy his burden the movant must make a showing that is quite clear what the

> truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact. . .'" Kober & Kyriss v. Stewart & Billings Deaconess Hospital, 148 Mont. 117, 122, 417 P.2d 476, 478.
>
> "The district court does not function to adjudicate genuine issues of fact on a motion for summary judgment cause--it merely determines whether such issues exist. Thus the party opposing the motion will be indulged to the extent of all inferences which may be reasonably drawn from the offered proof. Mally v. Asanovich, 149 Mont. 99, 105, 423 P.2d 294; Johnson v. St. Patrick's Hospital, 148 Mont. 125, 417 P.2d 469."

In determining whether disputed questions of fact remain outstanding in this case it should be kept in mind that the bare assertions found in appellant's briefs are not sufficient to defeat a motion for summary judgment. Likewise, the conclusory statements found in appellant's affidavits of February 13 and 24, to the effect that his dismissal: "was not done in the proper discharge of duty in that it violated constitutional rights, both State and Federal, was not done in accordance with the requirements of the Collective Bargaining Agreement and was not done within any superseding statutory requirements . . ." are not sufficient to defeat a motion for summary judgment. The appellant's conclusions of law would clearly not be admissible into evidence at trial, and are not properly before this Court. See, Rule 56(e) M.R.Civ.P.

It is concluded that the alleged libelous communication was absolutely privileged under the statute, which is constitutionally valid, as a consequence of which there is no outstanding issue of fact, and the respondent is entitled to have his motion for summary judgment granted, effective against the cause stated in the original complaint and repeated as Count I in the proposed amended complaint.

We turn now to a consideration of the remaining constitutional attacks against the statutory privilege found in Counts IV and V of the proposed amended complaint. Count IV contends that reliance on this statutory privilege is a violation of the privileges and immunities clause of the federal constitution, as well

as the equal protection clause, as it permits a libel which would be actionable against any other person. Count V alleges that reliance on the statutory privilege is unconstitutional.

Appellant's contention in Count IV of the proposed amended complaint is a novel interpretation of the constitution, but one without merit.

The privileges and immunities clause of the constitution prohibits a state from discriminating against the citizens of other states where there is no substantial reason for the discrimination beyond the fact that they are citizens of other states. See Toomer v. Witsell (1948), 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460. The inquiry in each case is whether reasons exist for the discrimination, and whether the degree of discrimination bears a close relation to the reasons.

The statutory privilege at issue in this case cannot possibly violate the privileges and immunities clause. All persons, be they citizens of Montana or citizens of any other state bringing a libel action in this state, are equally subject to the statutory defense.

Turning to the issue of equal protection, that issue is analyzed by using a two-step process. Initially, the Court must consider the nature of the classification and the individual interests affected, to determine what level of scrutiny is applicable to the classifications. Memorial Hospital v. Maricopa County (1974), 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306. Unless the classification touches on a fundamental right (such as religious freedom, freedom of speech or association, privacy or right to travel), or is drawn upon an inherently suspect distinction (such as race, religion or alienage), the constitutionality of the statutory discrimination is presumed; the only requirement being that the classification be rationally related to a legitimate state interest. New Orleans v. Dukes (1976), 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511. "Rationally related" means that the classification will be upheld if it has any

rational basis. See, Lindsley v. Natural Carbonic Gas Co. (1911), 220 U.S. 61, 31 S.Ct. 337, 55 L.Ed. 369.

No fundamental right or suspect class is at issue here, so the Court should apply the rational relation test. The rational basis for recognizing the statutory privilege is obvious, and has already been discussed. See Gregoire v. Biddle, supra, quoted in Storch.

Equal protection requires that all persons shall be treated alike under like circumstances. See, for example, Hartford Co. v. Harrison (1937), 301 U.S. 459, 57 S.Ct. 838, 81 L.Ed. 1223. As noted above in discussing the privileges and immunities clause, the statutory privilege is equally applicable to all who are "libeled" by public officials acting within the scope of their employment. Count IV of the proposed amended complaint has no basis in law.

The constitutional issues raised by the appellant in Count V are essentially variations on a theme which has already been considered. The appellant cites the case of Noll v. City of Bozeman (1975), 166 Mont. 504, 507, 534 P.2d 880, 881, wherein this Court said:

> "With reference to the subjects upon which the Constitution speaks, its declarations are binding upon the legislature; State ex rel. Pierce v. Gowdy, 62 Mont. 119, 203 P. 1115. Constitutional provisions are conclusive upon the legislature and prevent the enactment of any law which extinguishes or limits the powers conferred by the Constitution; State ex rel. Bonner v. Dixon, 59 Mont. 58, 195 P. 841; State ex rel. DuFresne v. Leslie, 100 Mont. 449, 50 P.2d 959."

Appellant argues that, in light of Art. II, Sec. 18, 1972 Mont. Const. which abolishes immunity for governmental entities, "except as may be specifically provided by law by a two-thirds vote of each House of the Legislature," the legislature's attempt to expand the constitutional privilege in libel actions under section 27-1-804, MCA, is unconstitutional. Appellant contends that this statutorily created privilege would not stand up to appellant's clear constitutional right to be protected against

libel under Art. II, Sec. 7, 1972 Mont.Const. This provision gives every person the right to speak freely and publish whatever they please on any subject, but makes them responsible for any abuse of that liberty.

Appellant's claims in regard to Count V are clearly without merit. The constitution does not define libel, just as it does not define the elements which make up any other actionable tort. This job is left to the courts and the legislature. Libel has always been defined as a false and unprivileged publication. This is true under Montana statute, as well as under common law principles. If a communication is privileged, it is not an actionable libel. Such privileges were established under the common law for public policy reasons. See, Gregoire v. Biddle, supra. Because such a communication is not a tort, no recognized wrong has been suffered which would give rise to a cause of action. Count V of the proposed amended complaint is without legal foundation.

The judgment of the District Court is affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices

Mr. Justice John C. Sheehy, dissenting:

I confess at the outset that I do not understand the foregoing opinion. Its _ratio_ _decidendi_ escapes me. Rather than attempting to refute what is in the foregoing opinion, therefore, I will here assert only what I think the rule in this case ought to be.

This case comes to us on essentially two grounds: (1) that Aaron P. Small was deprived of due process when he was removed as chairman of the English department of Eastern Montana College; and (2) that in his removal, he was libelled.

It is clear that Aaron P. Small was removed as chairman of the English department without being afforded due process as to his removal, including an evidentiary hearing where he would have the right to present favorable witnesses, and to confront and examine adverse witnesses. The grievance procedure provided in the collective bargaining agreement for the unit of which Small was a member is not a sufficient substitute for Small's right to come to the courts for protection of his constitutional due process rights. Section 1-3-204, MCA. I find no case cited in the foregoing opinion stating otherwise, and there could be none.

In like manner, summary judgment should not be granted against Small on his first amendment claims, and his libel claims, on the ground of lack of specificity in the pleadings. McRae gave as his reasons for dismissing Small as chairman his "inadequate leadership", his "failure to bring a polarized department into a smoother functioning unit", "acrimony had increased within the English department", and an allegation that Small had failed to effectively and conscientiously handle the administrative detail associated with his office.

Small has answered that these allegations are false. What more specificity could he at this stage allege, if his contention is true that such statements are false? The District Court and this Court are applying here the specificity requirements of civil right actions under federal law as exemplified by Rotolo v. Borough of Charleroi (3rd Cir. 1976), 532 F.2d 920, 923. In our state court, Small is not suing for a deprivation of his federal civil rights, but for his constitutionally protected rights under our state and federal constitution. In that situation, it should be recognized that our pleadings under the Montana Rules of Civil Procedure are notice pleadings only and that specificity occurs after discovery has been completed. Further, with regard to Small's libel action, there is a factual question existent as to whether he was discharged pursuant to "official action." The pleadings evince an underlying allegation that McRae was acting in concert with others to deprive Small of his chairmanship. Without further proceedings we cannot tell at this point whether "official action" was actually involved here or whether there was a drive to impugn his teaching and administrative integrity and ability in the guise of official action. That is an issue a jury should decide.

For those reasons, I would set aside the summary judgment, and let the facts come to light as to which party should receive judgment in this case. Therefore, I dissent.

_John C. Sheehy_
Justice

-28-

Mr. Justice Daniel J. Shea concurring.

I agree with the result reached by the majority, but not in its reasoning. Clearly, there was no libel. And just as clearly, the plaintiff should have exhausted the contract grievance procedures before resorting to the courts.

_____
Justice