No. 98-208

IN THE SUPREME COURT OF THE STATE OF MONTANA

1999 MT 134

294 Mont. 517

982 P.2d 1024

STEVE WINCHESTER,

Plaintiff and Appellant,

vs.

MOUNTAIN LINE, MARY PLUMLEY, and

THE BOARD OF PERSONNEL APPEALS,

DEPARTMENT OF LABOR,

Defendants and Respondents.

No

APPEAL FROM: District Court of the Fourth Judicial District,

In and for the County of Missoula,

The Honorable Ed McLean, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Richard R. Buley, Tipp & Buley, Missoula, Montana

For Respondents:

James A. Bowditch, Milodragovich, Dale, Steinbrenner & Binney, Missoula, Montana

Submitted on Briefs: December 3, 1998

Decided: June 14, 1999

Filed:

No

_____

Clerk


Justice James C. Nelson delivered the Opinion of the Court.


**¶1. Steve Winchester (Winchester) appeals from the Opinion and Order of the Fourth Judicial District Court, Missoula County, which affirmed the Final Order of Montana Board of Personnel Appeals which dismissed Winchester's unfair labor practice charge against Mountain Line and its general manager, Mary Plumley (collectively, "Mountain Line"). We reverse and remand for further proceedings consistent with this opinion.**

**¶2. Winchester raises one issue on appeal, which we restate as follows:**

**¶3. Did the District Court err in deciding that Winchester's unfair labor practice claims were subject to the final and binding arbitration clause in the collective bargaining agreement?**


## Background

**¶4. Winchester was employed by Mountain Line, an urban transportation district in Missoula, as a bus driver. Winchester was a member of Teamsters Union Local No. 2 (Teamsters) and served as the Teamsters' shop steward at Mountain Line. The employment relationship between Winchester and Mountain Line was governed by a Collective Bargaining Agreement (CBA) between the Teamsters and Mountain Line which was effective from June 2, 1993, to June 30, 1996.**

¶5. On July 16, 1993, Mountain Line suspended Winchester for allegedly violating Mountain Line's bus drivers' handbook by stopping a bus in the middle of an intersection and instructing a passenger to get off the bus and retrieve a hatchet which was laying on the street. On August 6, 1993, Mountain Line held a pre-termination hearing regarding the incident that gave rise to Winchester's suspension. Later that August, Mountain Line discharged Winchester, retroactive to July 16, 1993, for his alleged violation of the bus drivers' handbook.

¶6. On September 15, 1993, a grievance hearing was held regarding Winchester's discharge. Mountain Line upheld Winchester's discharge.

¶7. On September 29, 1993, the Teamsters asked Mountain Line to arbitrate the dispute over the reasons underlying Winchester's discharge pursuant to the arbitration clause in the CBA. On the following day, September 30, 1993, Winchester filed an unfair labor practice charge with the Montana Department of Labor and Industry, Board of Personnel Appeals (Board). Winchester's charge alleged that Mountain Line first suspended him and then discharged him for soliciting other employees to attend a meeting at his house to discuss the decertification process required to change union representation and because he was the shop steward. Therefore, Winchester asserted that Mountain Line committed unfair labor practices in violation of §§ 39-3-201 and 39-31-401(1), (2), and (4), MCA.

¶8. On October 10, 1993, Mountain Line responded to Winchester's charge. Mountain Line asserted that it discharged Winchester for just cause pursuant to the CBA. Mountain Line also pointed out that the Teamsters had requested that the dispute be resolved through the arbitration procedure set out in the CBA. Hence, Mountain Line urged the Board to defer to the arbitration procedure.

¶9. On October 25, 1993, the Board's investigator issued a Recommended Order wherein she recommended that Winchester's charge be dismissed without prejudice to any party and without deciding the merits of the charge. The investigator recommended that the Board defer to the already scheduled arbitration pursuant to the "pre-arbitral deferral" policy which the National Labor Relations Board (NLRB) set out in *Collyer Insulated Wire* (1971), 192 N.L.R.B. 837, 77 L.R.R.M. 1931, and which the Board adopted in *William Converse v. Anaconda Deer Lodge County*, ULP 43-81 (April 1982) and *James Forseman v. Anaconda Deer Lodge County*, ULP 44-81 (April 1982). Notwithstanding, the investigator recommended that the Board retain

jurisdiction over the matter so that the Board could hear the case if the dispute was not resolved within a reasonable time pursuant to the arbitration procedure set out in the CBA, if the arbitral procedure was not fair, or if the arbitrators reached a result which was repugnant to the public policy considerations contained in the Collective Bargaining for Public Employees Act, §§ 39-31-101 et seq., MCA.

¶10. Winchester filed objections to the investigator's Recommended Order on November 4, 1993. Winchester asserted that deferring to arbitration under *Collyer* was improper because the CBA stated that any alleged violation of federal or state law was not subject to the arbitration procedure. Since Winchester objected to the investigator's Recommended Order, the Board transferred the case to the Department of Labor's Hearings Bureau on December 22, 1993.

¶11. Despite Winchester's objection to the investigator's recommendation to defer the arbitration procedure, an arbitration hearing was held on December 1, 1993. Winchester did not attend the arbitration hearing. The arbitrators upheld Mountain Line's decision to discharge Winchester.

¶12. Thereafter, on November 25, 1994, Mountain Line filed a motion to dismiss Winchester's unfair labor practice charge on the grounds that the dispute was resolved at the arbitration hearing. On December 13, 1994, Winchester responded to Mountain Line's motion to dismiss by reiterating that the CBA specifically excluded claims made under state statutes from the arbitration. Hence, Winchester argued that deferral to the arbitration procedure under *Collyer* was improper, that the arbitration hearing violated the CBA and, therefore, that the arbiters' decision was not binding.

¶13. On July 27, 1995, a hearings officer issued an Order on behalf of the Board which denied Mountain Line's motion to dismiss. The hearings officer ruled that Winchester's charge alleged that Mountain Line violated the Collective Bargaining for Public Employees Act, and not the CBA. Consequently, the hearings officer ruled that deferral to arbitration under *Collyer* was inappropriate.

¶14. On August 16, 1995, Mountain Line filed objections to the hearings officer's Order. Mountain Line maintained that deferring to the arbitration procedure was proper and, in effect, that the hearings officer erred in denying its motion to dismiss.

¶15. On September 27, 1995, the Board held a hearing on Mountain's Line's objections to the hearings officer's Order which denied its motion to dismiss. On October 2, 1995, the Board issued its Final Order wherein it determined that the hearings officer erred in denying Mountain Line's motion to dismiss. The Board stated that the basis for Winchester's unfair labor practice charge was discrimination because of union activities. Since the CBA prohibited discrimination because of union membership, the Board ruled that Winchester's unfair labor practice charge was covered by the CBA and, therefore, that it was subject to the grievance procedure set out in the CBA which culminated in final and binding arbitration. Thus, the Board ruled that deferral to the arbitration under *Collyer* was proper. Accordingly, the Board reversed the hearings examiner's decision and dismissed Winchester's unfair labor practice charge.

¶16. Winchester filed a Petition for Judicial Review on October 18, 1995. After both parties briefed the issues, the District Court issued an Opinion and Order wherein the court affirmed the Board's decision to dismiss Winchester's unfair labor practice charge. Winchester appeals from this Opinion and Order.

## Standard of Review

¶17. The issue in the instant case concerns an interpretation of a contract, the CBA. The construction and interpretation of a contract is a question of law for the court to decide. *Stutzman v. Safeco Ins. Co. of America* (1997), 284 Mont. 372, 376, 945 P.2d 32, 34 (citing *Klawitter v. Dettmann* (1994), 268 Mont. 275, 281, 886 P.2d 416, 420.) We review a district court's conclusions of law to determine whether the court's interpretation of the law is correct. *Reichle v. Anderson* (1997), 284 Mont. 384, 387-88, 943 P.2d 1324, 1326 (citing *Carbon County v. Union Reserve Coal Co.* (1995), 271 Mont. 459, 469, 898 P.2d 680, 686).

## Discussion

¶18. *Did the District Court err in deciding that Winchester's unfair labor practice claims were subject to the binding arbitration clause in the collective bargaining agreement?*

¶19. Winchester asserts that, since the CBA specifically exempted from arbitration

alleged violations of federal and state law, *Collyer* is inapplicable and, hence, that the Board improperly deferred to the grievance procedure in the CBA which culminated in final and binding arbitration. Mountain Line maintains that *Collyer* is applicable and that the Board properly deferred to arbitration under *Collyer*.

¶20. In *Collyer*, the NLRB ruled that it would defer to an arbitration procedure established by a collective bargaining agreement before it would consider an unfair labor practice charge if certain conditions were met.[1] The NLRB ruled that deferment was appropriate in *Collyer* because: (1) there was a long-standing bargaining relationship between the parties; (2) there was no enmity by the employer toward the employee's exercise of protected rights; (3) the employer manifested a willingness to arbitrate; (4) the arbitration clause in the collective bargaining agreement was sufficiently broad to cover the dispute at issue; and (5) the collective bargaining agreement and its meaning lay at the center of the dispute and was thus "eminently well suited to resolution by arbitration." *Collyer*, 192 N.L.R.B. at 842, 77 L.R.R.M. at 1936. See also *Young v. City of Great Falls* (1982), 198 Mont. 349, 353, 646 P.2d 512, 514.

¶21. After a series of shifts in policy, the NLRB announced an extension to the policy set out in *Collyer* in *United Technologies Corp*. (1984), 268 N.L.R.B. 557, 115 L.R.R. M. 1049. In *United Technologies*, the NLRB held that it was proper to defer to an arbitration procedure established by a collective bargaining agreement even though the dispute arose under the National Labor Relations Act (NLRA) and did not necessarily require construction of the parties' collective bargaining agreement. In so holding, the NLRB explained that

It is fundamental to the concept of collective bargaining that the parties to a collective-bargaining agreement are bound by the terms of their contract. Where an employer and a union have voluntarily elected to create dispute resolution machinery culminating in final and binding arbitration, it is contrary to the basic principles of the [National Labor Relations] Act for the [National Labor Relations B]oard to jump into the fray prior to an honest attempt by the parties to resolve their disputes through that machinery. For dispute resolution under the grievance-arbitration process is as much a part of collective bargaining as the act of negotiating the contract. In our view, the statutory purpose of encouraging the practice and procedure of collective bargaining is ill-served by permitting the parties to ignore their agreement and to petition this Board in the first instance for remedial relief.

*United Technologies*, 268 N.L.R.B. at 559, 115 L.R.R.M. at 1051 (footnote omitted). Thus, since the alleged violation of the NLRA was "clearly cognizable under the broad grievance-arbitration provision of the . . . collective-bargaining agreement," the NLRB decided to defer the case to arbitration. United Technologies, 268 N. L.R.B. at 560, 115 L.R.R.M. at 1052.

¶22. Likewise, in *Hammontree v. National Labor Relations Board* (D.C. Cir. 1991), 925 F.2d 1486, (en banc), the District of Columbia Circuit Court of Appeals considered a challenge to a NLRB order that required the complainant to exhaust grievance remedies established by a collective bargaining agreement before the NLRB considered his unfair labor practice complaint. The complainant in *Hammontree* argued that the NLRB's deferment authority was limited by § 203(d) of the Labor Management Relations Act (LMRA), which provides that "[f]inal adjustment by a method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes *arising over the application or interpretation* of an existing collective-bargaining agreement." *Hammontree*, 925 F.2d at 1493 (quoting 29 U.S.C. § 173(d)) (emphasis added by the court). The complainant maintained that § 203(d) of the LMRA authorized deferment only in cases "arising over" interpretation of a collective bargaining agreement and argued that his discrimination claim under §§ 8(a)(1) and 8(a)(3) of the NLRA[2] did not "arise over" contract interpretation even though the collective bargaining agreement contained an anti-discrimination provision which paralleled §§ 8(a)(1) and 8(a)(3) of the NLRA. *Hammontree*, 925 F.2d at 1493. Thus, since his discrimination claim was actionable not only under §§ 8(a)(1) and 8(a)(3) of the NLRA but also under the collective bargaining agreement which prohibited "discrimination against any employee because of Union membership or activities" and "discriminatory acts prohibited by law," the complainant contended that his "claim [wa]s simply one that [arose] under a statutory provision that happens to be parallel to a claim that could be advanced under the contract," and, therefore, that his "claim does not rest upon a construction of the [collective bargaining agreement]." *Hammontree*, 925 F.2d at 1493-94.

¶23. Notwithstanding, the court rejected the complainant's argument and pointed out that his claim did not arise either under the NLRA or under the collective bargaining agreement; rather, his claim arose under both. *Hammontree*, 925 F.2d at 1494 (citing *Alexander v. Gardner Denver Co*. (1974), 415 U.S. 36, 52, 94 S.Ct. 1011, 1021, 36 L.Ed.2d 147). Thus, the court explained that

Hammontree cannot nullify his contractual claim simply by choosing to pursue his statutory claim. Such an interpretation of the law would severely undermine Congress' 'decided preference for private settlement of labor disputes without the intervention of government' as reflected in § 203(d). If a party could unilaterally release itself from a contractual pledge to submit complaints to arbitration simply because it had a parallel claim under the statute, then the pro-private dispute resolution policies of § 203(d) would be substantially abrogated.

*Hammontree, 925 F.2d at 1494 (quoting United Paperworkers International Union v. Misco, Inc. (1987), 484 U.S. 29, 37, 108 S.Ct. 364, 370, 98 L.Ed.2d 286)(footnote omitted). Therefore, the court concluded that the complainant's claim arose under the collective bargaining agreement and held that § 203(d) did not preclude the NLRB from deferring to the grievance procedure set out in the parties' collective bargaining agreement. Hammontree, 925 F.2d at 1494.*

**¶24. In *Small v. McRae* (1982), 200 Mont. 497, 651 P.2d 982, the public employee made an argument similar to the argument made by the complainant in *Hammontree*. In *Small*, the employee argued that the grievance procedures in the collective bargaining agreement were only applicable to resolve contractual disputes. *Small*, 200 Mont. at 505, 651 P.2d at 987. The employee argued that his claim "did not center on a contractual dispute but, rather, on a violation of a constitutionally protected right." *Small*, 200 Mont. at 505, 651 P.2d at 987. In considering the employee's argument, this Court stated**

Only in those cases where it is *certain* that the arbitration clause contained in a collective bargaining agreement is not susceptible to an interpretation that covers the dispute is an employee entitled to sidestep the provisions of the collective bargaining agreement.

*Small, 200 Mont. at 504, 651 P.2d at 986 (emphasis added) (citing Torrington Company v. Metal Products Workers Union Local 1645 (2nd Cir. 1966), 362 F.2d 677).*

**¶25. In the instant case, Article VII of the CBA provides:**

<u>Discrimination</u>

<u>Section 7.1</u>: There shall be no coercion, intimidation, or discrimination on the part of either the District or the Union, or their respective agents, officers, or members against any employee covered by this Agreement for reasons of age, race, sex, color, religious or political beliefs, national origin, marital status, physical handicap, *Union membership* or non-membership, or any other group or classes protected by State or Federal law.

Section 7.2: Any *alleged* violation of Title VI of the Civil Rights Act of 1964 or other applicable Federal or State statutes *shall be processed through the appropriate Federal and State agency(s) and will not be subject to the grievance and arbitration procedures as set forth in Articles 12 and 13.*

(Emphasis added.)

**¶26. Winchester's unfair labor practice charge alleged that Mountain Line discharged him for soliciting other employees to attend a meeting to discuss decertifying the union and because he was the shop steward. Hence, Winchester claimed that Mountain Line violated § 39-31-201, MCA, which provides:**

Public employees shall have and shall be protected in the exercise of the right of self-organization, to form, join, or assist any labor organization, to bargain collectively through representatives of their own choosing on questions of wages, hours, fringe benefits, and other conditions of employment, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection free from interference, restraint, or coercion.

Winchester also claimed that Mountain Line committed unfair labor practices under § 39-31-401, MCA, which provides in pertinent part:

It is an unfair labor practice for a public employer to:

(1) interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in 39-31-201;

(2) dominate, interfere, or assist in the formation or administration of any labor organization; however, subject to rules adopted by the board under 39-31-104, an employer is not prohibited from permitting employees to confer with him during working hours without loss of time or pay; . . . [or]

(4) discharge or otherwise discriminate against an employee because he has signed or filed an affidavit, petition, or complaint or given any information or testimony under this chapter . . . .

Thus, since his unfair labor practice charge alleged that Mountain Line violated §§ 39-31-201 and 39-31-401, MCA, Winchester argues that, pursuant to the plain language in

Section 7.2 of the CBA, his charge is not subject to the CBA's grievance and arbitration procedures.

¶27. Mountain Line, however, contends that Winchester's allegations are "covered by" Section 7.1 of the CBA even though he generally alleged that Mountain Line violated §§ 39-31-201 and 39-31-401, MCA. In effect, Mountain Line asserts that, as in *United Technologies* and *Hammontree*, Section 7.1 of the CBA encompassed the allegations in Winchester's unfair labor practice charge and paralleled the claims that he advanced in his unfair labor practice charge. Therefore, Mountain Line maintains that the Board properly deferred to the arbitration procedure set out in the CBA.

¶28. Despite Mountain Line's argument, the plain, ordinary language in Section 7.2 of the CBA shows that the Board should not have deferred to the grievance and arbitration procedure set forth in the CBA. See *Hughes v. Blankenship* (1994), 266 Mont. 150, 154, 879 P.2d 685, 687 (citing *National Labor Relations Board v. Superior Forwarding, Inc.* (8th Cir. 1985), 762 F.2d 695, 697) (stating that "[c]ourts interpret contractual provisions according to the plain, ordinary language used by the parties."). The plain language of Section 7.2 of the CBA excludes "any *alleged* violation of . . . state statutes . . ." from the CBA's grievance and arbitration procedures. (Emphasis added.) Here, Winchester *alleged* that Mountain Line violated §§ 39-31-201 and 39-31-401, MCA. Thus, it is "certain," under Section 7.2 of the CBA, that Winchester's unfair labor practices charge, which alleged that Mountain Line violated §§ 39-31-201 and 39-31-401, MCA, was not subject to the grievance and arbitration provisions in the CBA. See *Small*, 200 Mont. at 504, 651 P.2d at 986.

¶29. In sum, even if Winchester's charge was covered by Section 7.1 of the CBA, the plain language in Section 7.2 of the CBA excludes his unfair labor practice charge from the grievance and arbitration procedure set out in the CBA. Accordingly, the District Court erred in ruling that the Board properly deferred to the arbitration procedure in the CBA.

¶30. Reversed and remanded for further proceedings consistent with this opinion.

/S/ JAMES C. NELSON

We Concur:

/S/ J. A. TURNAGE

/S/ KARLA M. GRAY

/S/ WILLIAM E. HUNT, SR.

/S/ W. WILLIAM LEAPHART

/S/ JIM REGNIER

/S/ TERRY N. TRIEWEILER

1. [1] The NLRB has set forth a separate "post-arbitral deferral" policy, which is not at issue in the instant case, under which the NLRB gives limited deference to an arbitrator's resolution of an unfair labor practice charge. See *Spielberg Manufacturing Co*. (1955), 112 N.L.R.B. 1080, 36 L.R.R.M. 1152 and *Raytheon Co*. (1963), 140 N.L.R.B. 883, 52 L.R.R.M. 1129, enforcement denied on other grounds, *Raytheon Co. v. National Labor Relations Board* (1st Cir. 1964), 326 F.2d 471.

2. [2] Section 8(a) of the NLRA provides in pertinent part:

It shall be an unfair labor practice for an employer--

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7; . . .

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . .

No

29 U.S.C. § 158(a).